Dawn PULLIN, Plaintiff,

v.

CITY OF CANTON, et al., Defendants.

No. 1:00–CV–2079.

United States District Court,
N.D. Ohio,
Eastern Division.

March 9, 2001.

Jonathan E. Morris, Redinger & Morris, Canton, OH, for Dawn Pullin, plaintiff.

Kevin R. L'Hommedieu, City of Canton Law Department, Canton, OH, Mariella Mestel, Canton Law Department, Canton, OH, for City of Canton, Thomas W. Wyatt, John Dittmore, defendants.

## ORDER

GWIN, District Judge.

On February 16, 2001, Defendant Canton Police Sergeant John Dittmore moved for summary judgment on the 42 U.S.C. § 1983 and related state claims asserted against him by Plaintiff Dawn Pullin [Doc. 29]. Finding genuine issues of fact exist with regard to some, but not all, of Pullin's claims, the Court grants in part and denies in part Dittmore's motion.

Dawn Pullin sues Canton Police Sergeant John Dittmore for violations of her civil rights.[1] Pullin encountered Dittmore after she pulled over at the scene of a traffic stop. She says she tried to offer her assistance to the stopped driver when Dittmore subjected her to various constitutional deprivations. Dittmore insists he afforded Plaintiff Pullin her constitutional rights while arresting her for obstructing official business.

The traffic stop at the center of this dispute occurred shortly after 5:00 p.m. on

---

1. Pullin earlier dismissed her suit against the City of Canton and Canton Police Chief Thomas Wyatt.

August 15, 1999. That evening, Defendant Canton Police Sergeant John Dittmore observed a vehicle with a temporary spare tire traveling at a high rate of speed on Interstate 77. Because of the spare tire, Dittmore concluded the vehicle's speed created a safety risk. He initiated a traffic stop.

After stopping the vehicle, Dittmore recognized the driver as Kelly Barksdale, a convicted drug offender. Barksdale informed Dittmore that he was returning his vehicle to a rental car facility at the Akron/Canton Airport. As Barksdale identified his destination, Dittmore smelled marijuana from inside the vehicle.

Dittmore decided to call in a K–9 unit to sniff the vehicle for illegal drugs. Arriving shortly thereafter, the K–9 unit indicated the presence of illegal drugs in Barksdale's vehicle. Near this time, Dittmore learned from his dispatcher that Barksdale had a warrant for his arrest.

After asking Barksdale to exit his vehicle, Dittmore performed a pat down. During the pat down, Dittmore recovered a brown paper bag from Barksdale's jogging pants; the bag contained $6,350 in small denominations wrapped in rubber bands.

Dittmore then decided he would both place Barksdale under arrest and search the vehicle. But before doing so, Dittmore called for back-up. A second police officer soon joined Dittmore and the K–9 unit on the scene. Ohio State Highway Patrol Trooper Scott Rike also arrived to offer assistance.

Shortly thereafter, Plaintiff Dawn Pullin arrived at the scene. She had been en route to a birthday party with a friend and several children. But as she drove past the scene of the traffic stop, she says that she heard Barksdale call her name. Recognizing Barksdale as a friend, Pullin decided to stop.

Pullin steered her vehicle off to the side of Interstate 77, a few car lengths in front of Barksdale's vehicle. She then exited her vehicle and walked toward the officers. Dittmore met Pullin before she reached Barksdale's vehicle.

Pullin and Dittmore offer thoroughly divergent accounts of what transpired next. They agree only that their encounter ended in Dittmore's arrest.

Dittmore describes a combative exchange with a belligerent bystander. He says Pullin approached the scene demanding to know what was being done to Barksdale. She allegedly refused to identify herself. She also allegedly ignored Dittmore's orders to leave the scene.

Attempting to end the exchange, Dittmore says he escorted Pullin to her vehicle while explaining for a third time that she had to leave. But as soon as he released her arm, Dittmore says Pullin walked back toward the scene. At this point, Dittmore says he pointed to the vehicle and said, "You need to get in your car and leave!" When she allegedly refused this final order, Dittmore placed Pullin under arrest for obstructing official business.

Dittmore says he directed another officer on the scene to put handcuffs on Pullin. The officer placed one cuff on Pullin's wrist, but she then allegedly resisted by stiffening both of her arms. Dittmore says he then helped the officer get both cuffs on Pullin.

After handcuffing Pullin, Dittmore says he searched her vehicle. He found Pullin's purse inside the vehicle. He took a bank statement and an address book from the purse.

Once he completed the search, Dittmore took Pullin to the Canton Police Department to complete arrest and complaint forms.[2] He later transported her to the Stark County Jail for booking.

Pullin describes a completely different encounter with Dittmore. She says she approached the scene only to see if Barks-

---

**2.** Dittmore released Barksdale after learning that the warrant for his arrest had been can-

celled.

dale needed someone to notify his family about his predicament. But she insists Dittmore ignored her offer of help and instead launched a barrage of questions and orders at her.

Pullin says she told Dittmore that she did not mean to cause any problems and then turned to walk away. However, she says Dittmore raced past her and began searching her vehicle. While searching through her purse, Dittmore allegedly told Pullin that she was a drug dealer because "you all are drug dealers." Pullin, an African–American, understood Dittmore to mean that all African–Americans are drug dealers.

After completing his search, Pullin says Dittmore ordered another officer to put her in handcuffs. When the officer hesitated, Pullin says Dittmore "pounced on me and forcefully grabbed my right wrist, yanked it behind [my] back, and contorted it in a painful and violent manner; he then grabbed my left hand and forced it behind my back to complete the handcuffing." Dittmore then allegedly pulled Pullin toward his police cruiser.

Pullin says Dittmore took her to the Canton Police Department to conduct an interrogation. He allegedly asked Pullin to identify her role in various drug-dealing networks. Pullin says that after she explained that she was not a drug dealer, Dittmore again said that "you all are drug dealers." After ending the interrogation, Pullin says Dittmore took her to the Stark County Jail.

On January 6, 2000, Pullin and Dittmore relayed these accounts at Pullin's criminal trial in the Canton Municipal Court. The jury found Pullin not guilty of obstructing official business.

■ On August 15, 2000, Pullin filed this lawsuit against Dittmore. She sues Dittmore under 42 U.S.C. § 1983, alleging various underlying constitutional violations. Specifically, Pullin alleges that Dittmore conducted an unreasonable search of her vehicle, arrested her without probable cause, and used excessive force in effecting her arrest, all in violation of the Fourth and Fourteenth Amendments of the United States Constitution.[3] Pullin also says Dittmore subjected her to arrest on account of her race, in violation of her equal protection rights under the Fourteenth Amendment.[4]

Beyond her federal claims, Pullin asserts several claims under Ohio law. These claims include assault, battery, false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress.

Dittmore now seeks summary judgment on all of Pullin's claims. He challenges whether Pullin has offered sufficient evidence to support her constitutional claims. He also claims immunity under federal and state law.

The Court considers Dittmore's motion below.

## II.

A court may grant summary judgment only if the materials properly before the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving

---

3. Pullin also asserts a violation of her Eighth Amendment rights. But Pullin does not offer any evidence that the conditions of her brief confinement violated the Constitution. Rather, the conduct Pullin cites as violating the Constitution falls directly under the Fourth and Fourteenth Amendments. The Court analyzes the claims accordingly.

4. Pullin also brings her selective enforcement claim under 42 U.S.C. § 1981 and § 1985,

Neither statute applies to such claims. Section 1981 addresses discrimination in contractual relationships, most typically those involving employment. *Morris v. Office Max. Inc.,* 89 F.3d 411, 413 (7th Cir.1996). Section 1985 deals with conspiracies directed toward the deprivation of civil rights. Because Pullin's selective enforcement claim involves neither contractual discrimination nor a conspiracy, the Court analyzes the claim solely under the Equal Protection Clause.

party has the burden of showing conclusively that no genuine issue of material fact exists. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). In deciding whether the moving party has met this burden, a court views the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

A factual dispute precludes summary judgment only if it is material, that is, if it relates to a matter essential to adjudication. The dispute must concern facts that, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The factual dispute must also be genuine. The facts must be such that if they were proven at trial a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. The disputed issue does not have to be resolved conclusively in favor of the nonmoving party, but that party is required to present significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial. *60 Ivy Street*, 822 F.2d at 1435 (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Thus, the judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *60 Ivy Street*, 822 F.2d at 1436 (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505). Accordingly, viewing the evidence in the light most favorable to the nonmoving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505.

### III.

#### A.

Plaintiff Pullin sues Defendant Dittmore under 42 U.S.C. § 1983. This statute provides recovery for constitutional deprivations suffered under the color of state law. 42 U.S.C. § 1983 (stating that every person who, under color of state law, causes "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."); *Foy v. City of Berea*, 58 F.3d 227, 229 (6th Cir.1995) ("In order to prevail in a section 1983 action, the plaintiff must prove that some conduct by a person acting under color of state law deprived the plaintiff (or her decedent) of a right secured by the Constitution or other federal laws.").

Dittmore seeks summary judgment on Pullin's § 1983 claims. He contends that Pullin has not offered sufficient evidence of her alleged constitutional deprivations. He also raises the doctrine of qualified immunity as a defense to liability.

The doctrine of qualified immunity shields state actors from liability based on their discretionary acts. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages"). In so doing, the doctrine gives state actors the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin. *Wyatt v. Cole*, 504 U.S. 158, 167, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) ("Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their

ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service.").

■ But state actors lose this immunity when they violate clearly established constitutional rights of which a reasonable person should have known. *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727 (holding that qualified immunity shields state actors only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The doctrine thus offers no solace to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Accordingly, in analyzing Pullin's § 1983 claims, the Court looks first to whether Pullin offers sufficient evidence of a constitutional violation. If so, the Court decides whether the violation involved a clearly established constitutional right of which a reasonable person would have known.

1.

■ Pullin first challenges the constitutionality of her arrest. She says Dittmore arrested her without probable cause.

■ The Fourth Amendment authorizes only reasonable arrests. U.S. Const. amend. IV ("The right of the people to be secure in their persons ... against unreasonable ... seizures ... shall not be violated."). A reasonable arrest is one based on probable cause, i.e., "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

Whether Dittmore arrested Pullin without probable cause remains subject to a genuine factual dispute. Dittmore and Pullin offer conflicting accounts of their encounter. The constitutionality of Pullin's arrest depends on which version is true.

Dittmore offers sufficient evidence to prove he had probable cause to arrest Pullin for obstructing official business. Under Ohio law, a person obstructs official business by purposely impeding a public official from performing his lawful duties. Ohio Rev.Code § 2921.31(A).[5] Dittmore testifies that Pullin interrupted his traffic stop with belligerent demands for information, and then ignored multiple requests to leave the scene. Ohio State Highway Patrol Trooper Rike corroborates Dittmore's testimony. Dittmore and Rike's testimony would allow a reasonable juror to conclude Dittmore arrested Pullin with probable cause.

However, Pullin presents evidence that refutes Dittmore's assertion of probable cause. Pullin testifies that she only asked Dittmore whether "he intended to arrest [Barksdale] because I would like to alert his family." She also says she tried to leave the scene immediately upon Dittmore's order to do so. Donita Pugh, a passenger in Pullin's vehicle, partially corroborates Pullin's testimony, stating that she saw Pullin attempt to leave the scene on her own. Crediting Pullin and Pugh's testimony, a reasonable juror could find that Dittmore lacked probable cause to arrest Pullin.

With sufficient evidence of a Fourth Amendment violation, the Court turns to the qualified immunity analysis. In particular, the Court decides whether Pullin's allegedly unconstitutional arrest involved clearly established constitutional rights.

---

**5.** This statute provides in pertinent part:
(A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public offi-

cial's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

There is no question that the Fourth Amendment right to be free from unreasonable seizures is, as a general matter, clearly established. *Watkins v. City of Southfield*, 221 F.3d 883, 887 (6th Cir. 2000). But the qualified immunity inquiry is more searching. The ultimate question is whether the contours of the constitutional right involved were so clear that any reasonable police officer in Dittmore's position would have realized his conduct violated the right. *Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Long v. Norris*, 929 F.2d 1111, 1115 (6th Cir.1991). In answering this question at the summary judgment stage, the Court looks only to whether Pullin " 'has alleged sufficient facts supported by sufficient evidence to indicate what [Dittmore] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights.' " *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir.1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994)).

Pullin offers evidence that Dittmore acted in an objectively unreasonable manner in arresting her for obstructing official business. To make the arrest, Dittmore had to reasonably suspect Pullin was purposely trying to prevent him from doing his job. But Pullin says she told Dittmore that she had come upon the scene only to see if she should contact Barksdale's family. She further says she started to leave the scene at Dittmore's first request. Under such circumstances, no reasonable officer would conclude that Pullin approached the scene with a "purpose to prevent, obstruct, or delay" official police business. Ohio Rev.Code § 2921.31.

Thus, Pullin has met her burden of offering sufficient evidence to both establish a constitutional violation and defeat Dittmore's qualified immunity. Accordingly, Pullin's unlawful arrest claim under § 1983 survives summary judgment.

**2.**

Pullin's second alleged constitutional deprivation concerns the force used to place her under arrest. She insists Dittmore used excessive force when putting her in handcuffs.

The Fourth Amendment's prohibition of unreasonable seizures limits the amount of force police officers may use during an arrest. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Specifically, officers may use only the degree of force necessary to effect an arrest. *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir.1997).

In assessing a particular use of force, the Court will not second-guess an officer's judgment from the comfort of chambers. Rather, the Court asks whether a reasonable officer on the scene would have employed a similar degree of force. *Smith v. Freland*, 954 F.2d 343, 345–47 (6th Cir.1992); *Monday*, 118 F.3d at 1104. In so doing, the Court remains mindful that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

The evidence in this case belies any claim of excessive force. Dittmore acknowledges that he used some force in handcuffing Pullin But he says he did so because she had stiffened her arms to prevent being handcuffed. Pullin does not dispute that she at least lightly resisted being placed in handcuffs. She merely says that Dittmore was too rough in pulling her arms together. Absent evidence of more abusive or violent behavior, Dittmore's attempt to control a resisting suspect cannot sustain a constitutional claim.[6] *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 ("Not every push or shove, even if it may

---

**6.** Pullin says she suffered various injuries as a result of Dittmore's use of force. However, that a suspect suffers injuries while being handcuffed "does not transform a reasonable response into an unreasonable response or make [an officer] strictly liable for an unanticipated injury." *Wallace v. City of Shelby*, 968 F.Supp. 1204, 1211 (N.D.Ohio 1997).

later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.") (internal quotations omitted).

■ Without sufficient evidence of excessive force, the Court need not examine Dittmore's assertion of qualified immunity. Nevertheless, the Court finds that, at the very least, "officers of reasonable competence could disagree" as to the degree of force necessary to arrest Pullin. *Malley,* 475 U.S. at 341, 106 S.Ct. 1092. Thus, even if the evidence in this case could possibly support an excessive force claim, Dittmore is immune from liability. *Id.*

For these reasons, the Court grants summary judgment to Dittmore on Pullin's excessive claim under § 1983.

3.

■ Next, Pullin challenges the constitutionality of Dittmore's search. She says Dittmore lacked any justification for searching her vehicle.

■ The Fourth Amendment bars unreasonable searches. U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches ... shall not be violated."). A search absent a warrant is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ One such exception is for searches incident to a lawful arrest. *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Under this exception, a lawful custodial arrest justifies a contemporaneous warrantless search of the person arrested, as well as of the immediately surrounding area. *Id.* The area subject to such a search includes a

suspect's automobile, even when the suspect has been separated from his car before the police officers have conducted the search. *United States v. Mans,* 999 F.2d 966, 968–69 (6th Cir.1993); *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

Here, Dittmore says he searched Pullin's vehicle incident to her lawful arrest. He insists he only searched the vehicle after he placed Pullin under arrest. And he says he conducted the search primarily to find some form of identification for Pullin, who, he says, had refused to give her name.

Pullin describes the search differently. She testifies that Dittmore initiated the search before the placed her under arrest. Pugh gives similar testimony.

Based on this testimony, a reasonable juror could conclude Dittmore searched Pullin's vehicle prior to placing her under arrest. Dittmore does not even attempt to defend such a search. He thus acknowledges that a search prior to Pullin's arrest would violate the Fourth Amendment. And he concedes that no reasonable officer would conclude otherwise.

Moreover, even assuming Dittmore searched the vehicle after he arrested Pullin, the search may nevertheless violate the Fourth Amendment. As explained above, genuine issues of fact remain as to whether Dittmore lawfully arrested Pullin. If he arrested Pullin without probable cause, Dittmore cannot defend his search as incident to a lawful arrest.[7]

For these reasons, Dittmore is not entitled to summary judgment on Pullin's unreasonable search claim under § 1983.

4.

■ Finally, Pullin alleges that race discrimination led to her arrest and deten-

---

7. Further, at trial, Dittmore must do more than just show he searched the vehicle after lawfully arresting Pullin. Dittmore acknowledges that he initiated contact with Pullin after she exited her vehicle. In such a situation, the search incident to a lawful arrest exception to the warrant requirement does not necessarily allow for a search of the vehi-

cle. *United States v. Hudgins,* 52 F.3d 115, 119 (6th Cir.1995) (noting that *Belton's* approval of vehicle search incident to lawful arrest does not apply when officer makes contact after suspect exits vehicle). Rather, Dittmore must show that searching Pullin's vehicle after her arrest was reasonable under the circumstances. *Id.*

tion. Specifically, she says Dittmore selectively enforced the law against her because she is an African–American.

■ The Equal Protection Clause of the Fourteenth Amendment prohibits purposeful discrimination in the enforcement of laws. Discrimination is purposeful "if it is intended to accomplish some 'forbidden aim.'" *Gardenhire v. Schubert,* 205 F.3d 303, 319 (6th Cir.2000) (quoting *Futernick v. Sumpter Township,* 78 F.3d 1051, 1056 (6th Cir.1996)). One such "forbidden aim" is the selective enforcement of laws because of race.

■ To establish a selective enforcement claim, a plaintiff must prove three elements:

First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*United States v. Anderson,* 923 F.2d 450, 453 (6th Cir.1991); *Gardenhire,* 205 F.3d at 319.

Here, Pullin insists Dittmore arrested her not for obstructing official business, but for being an African–American. Pullin testifies that Dittmore twice remarked that "you all are drug dealers." Pullin says Dittmore meant that she, Barksdale, and all other African–Americans are drug dealers.

If stated and intended, the statement is bigoted and worthy of condemnation. However, standing alone, this statement cannot support a claim for selective enforcement.

■ The standard for establishing a selective enforcement claim is a "demanding one." *Stemler v. City of Florence,* 126 F.3d 856, 873 (6th Cir.1997). State actors benefit from a "strong presumption" that they have properly discharged their duties; only "clear evidence" to the contrary will overcome this presumption. *Id.*

Pullin has not met this burden. In particular, she does not offer evidence satisfying the "absolute requirement" of any selective enforcement claim—a showing "that similarly situated persons outside her category were not prosecuted." *Id.* In the absence of such evidence, this is not one of the "rare" cases in which a selective enforcement claim survives summary judgment. *Id.*

Accordingly, without regard to his qualified immunity defense, Dittmore is entitled to summary judgment on Pullin's selective enforcement claim under § 1983.

**B.**

■ Beyond 42 U.S.C. § 1983, Pullin seeks to recover under various state tort causes of action. Dittmore seeks summary judgment on each of these state claims. He says Ohio law provides him with immunity from tort liability.

Ohio Revised Code § 2744.03(A)(6)(b) provides limited immunity to political subdivision employees. When engaged in governmental functions, such employees are immune from tort liability unless they act "with malicious purpose, in bad faith, or in a wanton or reckless manner...." § 2744.03(A)(6)(b).[8]

---

8. "Malice" is the willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified. *Cook v. City of Cincinnati,* 103 Ohio App.3d 80, 90, 658 N.E.2d 814, 821 (1995); *Piro v. Franklin Twp.,* 102 Ohio App.3d 130, 139, 656 N.E.2d 1035, 1041 (1995). "Bad faith" includes a dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive. *Cook,* 103 Ohio App.3d at 90–91, 658 N.E.2d at 821; *Piro,* 102 Ohio App.3d at 139, 656 N.E.2d at 1041. "Wanton" misconduct refers to one's failure to exercise any care whatsoever. *Fabrey v. McDonald Village Police Dept.,* 70 Ohio St.3d 351, 356, 639 N.E.2d 31. 35 (1994); *Hawkins v. Ivy,* 50 Ohio St.2d 114,

Dittmore insists he did not act so egregiously as to lose his tort immunity.[9] He contends that he properly handled a contentious encounter with an interfering bystander. And he offers sufficient evidence to support this contention.

But Pullin offers evidence that paints a far more damaging portrait of Dittmore's behavior. Pullin says Dittmore became "enraged" once she inquired about contacting Barksdale's family. She says he immediately began searching her vehicle while calling both her and all other African-Americans drug dealers. And despite her apologies and attempt to comply with his order to leave, Pullin says Dittmore placed her under arrest. Pugh also describes Dittmore as "out of control" during his encounter with Pullin.

This testimony would allow a reasonable juror to conclude Dittmore acted in a malicious or reckless manner while interacting with Pullin. Thus, at this stage, Dittmore cannot avail himself of the immunity afforded political subdivision employees. A jury will ultimately determine whether this immunity shields Dittmore from liability on Pullin's tort claims.

Accordingly, the Court find Dittmore is not entitled to summary judgment on Pullin's state claims.

### IV.

For the reasons set forth above, the Court grants in part and denies in part Dittmore's motion for summary judgment. The Court grants the motion to the extent it seeks judgment on Pullin's excessive force and selective enforcement claims un-der § 1983. However, the Court denies the motion in all other respects.

IT IS SO ORDERED.

---

363 N.E.2d 367 (1977) (syllabus). "Reckless" refers to conduct that causes an unreasonable risk of harm and is "substantially greater than that which is necessary to make his conduct negligent." *Thompson v. McNeill*, 53 Ohio St.3d 102, 104–05, 559 N.E.2d 705, 708 (1990) (quoting Restatement (Second) of Torts § 500 (1965)).

9. The parties do not dispute that Dittmore is an employee of a political subdivision or that police work is a governmental function. Ohio Rev.Code § 2744.01(F) (defining "political subdivision"); § 2744.01(C)(2) (defining "governmental function").