Hans D'AGASTINO, Plaintiff,

v.

CITY OF WARREN, et al., Defendants.

No. 4:01–CV–1386.

United States District Court,
N.D. Ohio,
Eastern Division.

Dec. 11, 2001.

Gregg A. Rossi, Rossi & Rossi, Youngstown, OH, for Plaintiffs.

Amie L. Bruggeman, Stephen W. Funk, Roetzel & Andress, Akron, OH, for Defendants.

## OPINION

GWIN, District Judge.

■ On October 29, 2001, Defendants City of Warren and Officer Richard Kovach motioned for summary judgment [Doc. 20].[1] Plaintiff Hans D'Agastino opposes the motion. The Defendants also move to partially strike an affidavit filed by the plaintiff in support of his opposition to summary judgment [Doc. 26]. Finding that no genuine issues of material fact exist as to D'Agastino's claims, the Court grants both Defendants City of Warren and Kovach's motion for summary judgment.

### I. Background

In this case, Plaintiff D'Agastino says Officer Kovach used excessive force in effecting his arrest. As a result of this excessive force, D'Agastino says he suffered severe facial cuts and fractures requiring surgery to repair. The defendants deny D'Agastino's accusations.

The arrest at issue took place just after 9:00 p.m. on June 14, 2000. A few minutes

---

1. The complaint also names the City of Warren Police Department as a defendant. However, as the City of Warren Police Department is merely a governmental unit of the City of Warren and not a separate corporate body or legal entity, a claim against the police department is the same as a claim against the City of Warren itself. *See Papp v. Snyder,* 81 F.Supp.2d 852, 857 n. 4 (N.D.Ohio 2000).

Likewise, a claim against Officer Kovach in his official capacity is essentially a claim against the City of Warren. *Id.* (citing *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)). Therefore, the Court treats the complaint as if filed against the City of Warren and Officer Kovach in his individual capacity.

before 9:00 p.m., the police dispatcher sent two radio messages about D'Agastino to police officers on patrol. The first radio call occurred at 8:57 p.m. and directed officers to be on the lookout for a fifty-year-old, white male, wearing only green underwear, who had "escaped" from Trumbull Memorial Hospital.[2] The second call, at 8:59 p.m., was to advise officers that a citizen had called "to complain that someone tried to commandeer his vehicle and he [was required] swerve out of the way to miss him." At approximately the same time, the dispatcher sent a message over the police computers that the suspect was HIV positive and to use caution.

At 9:03 p.m., Officer Kovach spotted D'Agastino on East Market Street near a Dairy Mart store on the corner of Logan and East Market. Officer Kovach exited his car and told D'Agastino to stop. While their accounts differ slightly, both Kovach and D'Agastino agree that D'Agastino did not stop. Instead, he darted into the mid-dle of East Market Street. Officer Kovach followed him into the street.

The parties also agree that the two individuals first made contact in the middle of the street where Officer Kovach attempted to stop D'Agastino by hitting him in the leg with a police baton. D'Agastino says that he fell to the pavement after being hit once. Officer Kovach says he hit D'Agastino a second time in the back of the shoulder before he fell to the pavement.[3]

The parties' accounts of what happened diverge after D'Agastino began his fall to the pavement. Officer Kovach says that after the second blow D'Agastino "went limp" and fell, face first, to the pavement. After he handcuffed D'Agastino, Kovach says the plaintiff began spitting blood at him. At this point, Officer Kovach radioed for an ambulance. According to Officer Kovach, he physically restrained D'Agastino but did not cause his head to strike the ground.[4] He says that D'Agastino's facial

2. The dispatcher's description is best explained by detailing D'Agastino's day before his arrest. At approximately 9:30 a.m. that morning, D'Agastino was rear-ended in a 3-car motor vehicle accident while waiting for a red light in the City of Niles. D'Agastino was taken by ambulance to Trumbull Memorial Hospital. At the hospital, D'Agastino complained about pain in his neck, "head, lower back, hips, and legs." The hospital performed a CAT scan, a MRI scan, and blood tests. D'Agastino was released at approximately 4:00 p.m. after showing no apparent sign of injury.

Upon his release from the hospital, D'Agastino was arrested by the Trumbull County Sheriff's department for failing to appear in court for a hearing on a separate traffic accident in which he was involved. After he was booked and posted bond, D'Agastino went to Joe and Kay's bar. At the bar, D'Agastino drank a large number of alcoholic drinks. He does not dispute that a blood alcohol test administered later that evening measured his blood alcohol level at 0.26, well over the legal limit.

After a time, D'Agastino began making statements about committing suicide. He left the bar to walk back to Trumbull Memorial Hospital where he intended to admit himself as a patient. On the way, he stopped at another bar, called the Purple Onion. At the Purple Onion, D'Agastino told the bartender he felt like committing suicide and requested an ambulance. An ambulance arrived and transported him to Trumbull Memorial Hospital.

At the hospital, D'Agastino went to the emergency room where he was asked to take off his clothes. He was then only wearing a green bikini bathing suit. After waiting for approximately 20 minutes, D'Agastino decided to leave the hospital and to go back to Joe and Kay's bar, which was approximately 15 blocks away. D'Agastino's departure from the hospital prompted the police dispatcher's first radio message.

3. Regardless of whether there was one or two blows, the parties agree that Officer Kovach's use of his baton was not an excessive use of force.

4. Officer Kovach's account is mirrored in part by the declaration of Sergeant Ralph T.

and jaw injuries came from his initial fall to the pavement.

D'Agastino has a different version of events. He says that he broke his fall to the payment with his hand and arm. D'Agastino says he did not resist while Officer Kovach handcuffed him but that Kovach still "kept slamming my face down in the ground." After Kovach handcuffed him, D'Agastino says he attempted to turn his head to the side to inform Kovach that he was HIV positive and not violent, but that Kovach yelled at him and shoved his face back into the ground. D'Agastino says his injuries came from Officer Kovach's actions of forcing his face into the pavement.

An ambulance transported D'Agastino to Trumbull Memorial Hospital. He underwent oral surgery and was discharged from the hospital on June 22, 2000.[5]

On June 7, 2001, D'Agastino filed his complaint. He sues under 42 U.S.C. § 1983 (2001), alleging violations of his Fourth and Fourteenth Amendment rights. D'Agastino also asserts an assault and battery claim under Ohio law.

The defendants now seek summary judgment on D'Agastino's claims. They claim qualified immunity under federal and state law. The Court considers the defendants' motion below.

## II. Legal Standard

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Waters v. City of Morristown, Tenn.,* 242 F.3d 353, 358 (6th Cir.2001). A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106

Williams of the Braceville Township Police Department. Sergeant Williams arrived on the scene shortly after D'Agastino was brought to the ground and remained for three or four minutes until other Warren police officers arrived. Sergeant Williams says:

> During the entire period that I was at the scene, the suspect was located on the ground and appeared to be struggling and trying to get up. In response, it appeared that the officer was doing his best to keep the suspect under the [sic] control by holding him on the ground. At no time, however, did I witness the police officer use any excessive force of any kind or strike or hit the suspect in any way. Moreover, at not time did I witness the police officer strike the suspect's head or any other parts of his body against the pavement in any manner. Instead, it appeared to me that the police officer was doing his best to maintain con-

trol over a suspect who was being arrested and who was being non-cooperative.
Declaration of Ralph T. Williams at ¶ 3.

5. According to Robert D. Heckel, D.D.S., the oral surgeon who performed D'Agastino's operation on June 15, 2000, he suffered the following facial injuries: 1) compound comminuted alveolar fracture of the maxilla; 2) compound comminuted fracture of the left side of the mandible; 3) compound fracture of the symphysis of the mandible; 4) displaced fracture of left mandibular condyle; 5) probable fracture of right mandible; 6) four to five centimeter laceration of chin through and through; 7) four one to two centimeter lacerations of the lateral borders of the tongue; 8) multiple teeth fractures and crushed upper teeth into the sinuses.

Affidavit of Robert D. Heckel, D.D.S. at ¶¶ 2–3.

S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is not sufficient for the non-moving party merely to show that there is some existence of doubt as to the material facts. *Id.*

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *National Enters., Inc. v. Smith,* 114 F.3d 561, 563 (6th Cir.1997). Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All–Lock Co.,* 96 F.3d 174, 178 (6th Cir.1996) (internal quotations omitted).

### III. Motion to Strike Dr. Heckel's Affidavit

As a preliminary matter, the Court turns to the defendants' motion to strike a paragraph from Dr. Robert D. Heckel's affidavit. The plaintiff submitted Dr. Heckel's affidavit in support of his opposition to summary judgment. In the fourth paragraph of the affidavit, Dr. Heckel provides a medical opinion as to the cause of D'Agastino's injuries. The defendants seek to strike this paragraph from the record.

The defendants say the plaintiff violated the Court's order by failing to identify Dr. Heckel as an expert witness by September 3, 2001. The defendants also say the plaintiff violated Fed.R.Civ.P. 26(a)(2) by failing to provide Dr. Heckel's expert report by October 24, 2001, ninety days before the start of trial.

The plaintiff says it disclosed Dr. Heckel as a potential witness in a July 17, 2001, letter sent to the defendants' counsel. In addition, the plaintiff says Dr. Heckel need not comply with the written report re-

quirement of Fed.R.Civ.P. 26(a)(2)(B) because he was the treating physician and is not a witness "retained or specifically employed" for this case.

■ The Court denies the defendants' motion. The purpose of the discovery rules is to assist the parties in preparing for trial. *See, e.g., Ragge v. MCA/Universal Studios,* 165 F.R.D. 601, 603 (C.D.Cal. 1995); *see also Cooper v. Stender,* 30 F.R.D. 389, 393 (E.D.Tenn.1962) ("The broad purpose of the discovery rules is to enable the parties to prepare for trial. If the discovery rules are properly used, each party will know what to expect at the trial on the merits.").

While the defendants may have a legitimate argument whether Dr. Heckel's testimony should be admitted at trial, they cite no authority to justify striking part of his affidavit at this stage of the proceedings. Dr. Heckel's affidavit conforms with the requirements of Fed.R.Civ.P. 56(e).[6] Therefore, the Court will consider the entire affidavit for the purposes of the defendants' motion for summary judgment.

With this holding, the Court expresses no opinion on whether the plaintiff properly identified Dr. Heckel as an expert witness or whether he is required to provide a written report under Fed.R.Civ.P. 26(a)(2)(B). The Court will rule on these issues if a party makes a motion in limine in advance of trial.

### IV. Analysis

#### A. 42 U.S.C. § 1983

##### 1. Officer Kovach

Plaintiff D'Agastino first sues Defendant Kovach under 42 U.S.C. § 1983. This statute provides recovery for constitutional deprivations suffered under the color of

---

**6.** "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as wold be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e).

state law. 42 U.S.C. § 1983 (stating that every person who, under color of state law, causes "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...").

Kovach seeks summary judgment on D'Agastino's § 1983 claim. He raises the doctrine of qualified immunity as a defense to liability.

■ The doctrine of qualified immunity shields state actors from liability based on their discretionary acts. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages"). In so doing, the doctrine gives state actors the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin. *Wyatt v. Cole,* 504 U.S. 158, 167, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) ("Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service.").

■ Nevertheless, state actors lose this immunity when they violate clearly established constitutional rights of which a reasonable person should have known. *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727 (holding that qualified immunity shields state actors only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The doctrine thus offers no solace to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

The United States Court of Appeals for the Sixth Circuit has set forth a three-step process for evaluating claims of qualified immunity:

> First, we determine whether a constitutional violation has occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (en banc) (citing *Dickerson v. McClellan,* 101 F.3d 1151, 1157–58 (6th Cir.1996)).[7]

■ In analyzing D'Agastino's § 1983 claim, the Court looks first to whether he offers sufficient evidence of a constitutional violation. D'Agastino says Kovach violated the Fourth Amendment by subjecting him to excessive force. Even drawing all inferences in favor of the nonmoving party, D'Agastino does not offer sufficient evidence of such a violation.

■ The Fourth Amendment's prohibition of unreasonable seizures limits the amount of force a police officer may use during an arrest. *Graham v. Connor,* 490

**7.** The Court notes that the Sixth Circuit's three-step analysis incorporates the two-part inquiry articulated by the Supreme Court in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In *Saucier,* the Supreme Court said a court ruling on the qualified immunity issue must first consider this question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 121 S.Ct. at 2156. If a violation can be made out based on a parties' factual submissions, the next step "is to ask whether the right was clearly established." *Id.*

U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Specifically, officers may use only the degree of force necessary to effect an arrest. *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir.1997).

In *Graham*, the Supreme Court held that claims law enforcement officers have used excessive force during an arrest should be analyzed under the Fourth Amendment and its "reasonableness" standard. *Id.* at 395, 109 S.Ct. 1865. In determining the reasonableness of the force used under the Fourth Amendment, courts must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865.

In assessing a particular use of force, the Court will not second-guess an officer's judgment from the comfort of chambers. Rather, the Court asks whether a reasonable officer on the scene would have employed a similar degree of force. *Smith v. Freland*, 954 F.2d 343, 345–47 (6th Cir.1992); *Monday*, 118 F.3d at 1104. In so doing, the Court remains mindful that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

Under the Fourth Amendment's "reasonableness" standard, the Court finds insufficient evidence to support D'Agastino's claim of excessive force. D'Agastino did suffer severe facial injuries during his arrest. However, D'Agastino's version of events does not show Kovach's alleged use of force was unreasonable.

The police dispatcher call records show that Officer Kovach and D'Agastino were alone for approximately one and a half minutes before Sergeant Williams arrived at the scene.[8] D'Agastino says the initial fall did not injure him because he broke the fall with his arm. Instead, he testifies that Kovach drove his face into the ground while handcuffing him and repeatedly forced his head against the pavement when D'Agastino attempted to speak to Kovach. Specifically, D'Agastino testified:

Q: Now, you attempted to get back up you testified?

A: (Witness shaking head yes)

Q: Then what happened?

A: He kept slamming my face back down into the ground while trying to restrain my hands with his cuffs.

Q: Were you resisting him?

A: No, I was trying to move around

Q: You were trying to move around, trying to get back up?

A: I was trying to get back up.

Q: And did you have your hands behind your back?

A: He had one of them back there, and the other one was in the gut area.

Q: And were you bringing it back around?

A: I was trying.

Q: Were you able to?

A: No.

Q: And so then eventually you were handcuffed?

A: He did get the handcuffs on me but not as fast as he thought he might have.

Q: And then what happened once you were handcuffed?

Kovach radioed for an ambulance. At 9:04:47 p.m., Kovach radioed that the Braceville unit had arrived at the scene.

---

8. The police radio log for the incident shows that Officer Kovach saw and approached D'Agastino at 9:03:05 p.m. At 9:03:48 p.m.,

A: I just laid there.

Q: What happened there?

A: He was still on top of my back shoving me down and hollering at me. I tried to turn my head. Every time I tried to turn my head to talk to him he would shove my face down back in the ground.

Q: What happened then, the ambulance arrived?

A: Every time I took my head up to talk, that I'm HIV positive, I'm not violent, when I put your head to the fucking ground you keep it there you faggot.

. . . . .

Q: Do you know at which point or can you remember at which point you would have fractured your jaw?

A: Yes. As soon as I got thrown down on the ground and had my face shoved into it.

Q: I think that you said before that you fell to the ground when he used the nightstick?

A: The stick knocked me down. I broke the fall with my hand, my arm. My arm was extended out for that fall.

Q: When did you suffer the fractured jaw?

A: When he shoved my face into the pavement.

Q: How do you know that?

A: Because he knocked a couple of teeth out the first shot.

Q: Do you remember that?

A: Yes. And I remember him holding me by the neck and pushing my face down again and would not allow me to talk to him.

D'Agastino Deposition at 33–35, 36–37.

Additionally, Dr. Heckel, the doctor who performed D'Agastino's original surgery, says:

Assuming that Hans D'Agastino broke his fall with his arm and assuming that he did not strike his face upon his fall, it is my opinion to a reasonable degree of medical certainty, based upon my education, training and expertise, that the above-described observed injuries were incurred by Plaintiff after he was already on the ground, and these injuries are consistent with force being applied to Hans D'Agastino's face in contact with the pavement.

Affidavit of Robert D. Heckel, D.D.S. at ¶ 4.

The defendants' medical witness does not contradict D'Agastino's testimony on the facts surrounding his injuries. Dr. John A. Cheek, the defendant's medical expert, summarized his opinion of D'Agastino's injuries:

Based on my review of the attached medical records and based on my expertise and over 20 years of experience in the area of Oral & Maxillofacial Surgery. [sic] I can state to a reasonable degree of medical certainty that it is quite possible for a person to sustain Mr. D'Agastino's injuries form [sic] a dead fall to the face. Indeed, there is nothing about the nature of his injuries that would permit me to conclude, to a reasonable degree of medical certainty that his injuries were not in fact caused by such a fall.

Expert Report of John A. Cheek, D.D.S., M.D., at 1.

Dr. Cheek concludes that a dead fall to the face could have caused D'Agastino's injuries. However, the report does not rule out the possibility of another cause. Dr. Cheek merely concludes that nothing about the injuries rules out the possibility of a deadfall as their cause.

Taking the evidence in the light most favorable to D'Agastino, a reasonable officer on the scene would have used a similar degree of force. While D'Agastino testified he did not resist arrest, he did attempt to gain his feet once he fell to the ground. D'Agastino also says Officer Kovach had some difficulty handcuffing him.

D'Agastino did not obey Kovach's initial command to stop on the sidewalk. Instead, D'Agastino ran into the street. Officer Kovach knocked D'Agastino down and was attempting to handcuff D'Agastino in the middle of a four lane road without the aid of any warning lights.[9] As described above, the police dispatcher reported that D'Agastino had "escaped" from Trumbull Memorial Hospital wearing only his underwear. In addition, D'Agastino had consumed a large amount of alcohol.

■ An individual's actions while being taken into custody do not automatically immunize an officer for all force used against that individual. *See Monday*, 118 F.3d at 1104. However, because an individual suffers an unanticipated injury "does not transform a reasonable response into an unreasonable response or make [an officer] strictly liable for an unanticipated injury." *Pullin v. City of Canton*, 133

F.Supp.2d 1045, 1052 n. 6 (N.D.Ohio 2001) (quoting *Wallace v. City of Shelby*, 968 F.Supp. 1204, 1211 (N.D.Ohio 1997)). Taking the facts in the light most favorable to the plaintiff, the described events were not an objectively unreasonable use of force.

Having found insufficient evidence of a constitutional violation, the Court need not consider whether this alleged violation involved a clearly established constitutional right of which a reasonable officer would have known.[10] Accordingly, the Court grants Kovach's motion for summary judgment on D'Agastino's § 1983 claim.

### 2. City of Warren

■ D'Agastino also sues Defendant City of Warren under 42 U.S.C. § 1983. While a municipality is subject to suit under § 1983, *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality does not incur § 1983 liability based solely on the unconstitutional acts of its employees. That is, a municipality cannot be held liable on a theory of respondeat superior. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell*, 436 U.S. at 694–95, 98 S.Ct. 2018. Rather, a plaintiff must show that the municipality's own policies or customs proximately caused the constitutional violation:

**9.** Officer Kovach did not engage his warning lights when he first spoke to D'Agastino. Because of the speed in which the situation developed, Officer Kovach did not have a chance to not turn on his warning lights before pursuing D'Agastino into the street. The first warning lights were activated when Sergeant Williams of the Braceville Township Police Department arrived on the scene. Williams positioned his cruiser to protect Kovach and D'Agastino from traffic and activated his overhead lights.

**10.** The parties do not dispute that the right to be free from unreasonable seizures is clearly established. *Watkins v. City of Southfield*, 221 F.3d 883, 887 (6th Cir.2000). Any reasonable

officer should know he can employ only the degree of force reasonably necessary to effect a seizure.

Were the Court to address this issue, the critical question would become whether any reasonable officer in Kovach's position would know he allegedly violated D'Agastino's constitutional rights. Drawing all inferences in favor of the nonmoving party, the Court must look only to whether D'Agastino has alleged " 'sufficient facts supported by sufficient evidence' " showing Kovach acted in an objectively unreasonable manner. *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994)).

[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983.

*Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

 In his opposition to summary judgment, D'Agastino admits he cannot offer evidence to establish that the City of Warren established a policy, practice, or custom that actually caused or was closely related to his injuries. Therefore, the Court grants Defendant City of Warren's motion for summary judgment on the plaintiff's § 1983 claim.

### B. Assault and Battery

D'Agastino also asserts a state law claim for assault and battery against the defendants. Raising immunity as a defense, the defendants seek judgment on this claim.

 Under Ohio law, political subdivisions generally are "not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function" unless the plaintiff establishes that one or more of the five statutory exceptions apply. Ohio Rev.Code § 2744.02(A) (2001); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir.1995). As a police officer, Kovach's alleged actions were in performance of a governmental function. Ohio Rev.

Code § 2744.01(C)(2)(a) (defining "[t]he provision or nonprovision of police" as a governmental function); *Ziegler v. Mahoning County Sheriff's Dep't*, 137 Ohio App.3d 831, 835–36, 739 N.E.2d 1237, 1241 (2000). None of the five statutory exceptions listed in Ohio Rev.Code § 2744.02(B) apply to Kovach's alleged actions while fulfilling a governmental function. *See Ziegler*, 137 Ohio App.3d at 836, 739 N.E.2d at 1241–42 (stating Ohio Rev.Code § 2744.02(B) does not create an exception from immunity for intentional torts). Under Ohio Rev.Code § 2744.02, Defendant City of Warren is entitled to immunity from D'Agastino's assault and battery claim.

Since none of the statutory exceptions of Ohio Rev.Code § 2744.02(B) apply, the Court need not consider whether any of the defenses set forth in Ohio Rev.Code § 2744.03(A) apply to the City of Warren. *Ziegler*, 137 Ohio App.3d at 836, 739 N.E.2d at 1241 (citing *Cater v. City of Cleveland*, 83 Ohio St.3d 24, 31–32, 697 N.E.2d 610, 617 (1998)); *see also Sargi*, 70 F.3d at 913. Therefore, the Court grants Defendant City of Warren's motion for summary judgment on the assault and battery claim.

 With respect to Defendant Kovach, Ohio Rev.Code § 2744.03(A)(6)(b) provides limited immunity to political subdivision employees. When engaged in governmental functions, such employees are immune from tort liability unless they act "with malicious purpose, in bad faith, or in a wanton or reckless manner ..." Ohio Rev.Code § 2744.03(A)(6)(b).[11]

---

**11.** "Malice" is the willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified. *Cook v. City of Cincinnati*, 103 Ohio App.3d 80, 90, 658 N.E.2d 814, 821 (1995); *Piro v. Franklin Twp.*, 102 Ohio App.3d 130, 139, 656 N.E.2d 1035, 1041 (1995). "Bad faith" includes a dishonest pur-

pose, conscious wrongdoing, or breach of a known duty through some ulterior motive. *Cook*, 103 Ohio App.3d at 90–91, 658 N.E.2d at 821; *Piro*, 102 Ohio App.3d at 139, 656 N.E.2d at 1041. "Wanton" misconduct refers to one's failure to exercise any care whatsoever. *Fabrey v. McDonald Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35 (1994);

As discussed above, Officer Kovach's actions in arresting D'Agastino were objectively reasonable. Because his actions were objectively reasonable, they were not malicious, in bad faith, or done in a wanton or reckless manner. *See Boyer v. City of Mansfield,* 3 F.Supp.2d 843, 848 (N.D.Ohio 1998). Officer Kovach is entitled to immunity under Ohio Rev.Code § 2744.03. For this reason, the Court grants Kovach's motion for summary judgment on D'Agastino's assault and battery claim.

## V. Conclusion

For the reasons discussed above, the Court grants the defendants' motion for summary judgment. The plaintiff's claims are dismissed.

IT IS SO ORDERED.

*Hawkins v. Ivy,* 50 Ohio St.2d 114, 363 N.E.2d 367 (1977) (syllabus). "Reckless" refers to conduct that causes an unreasonable risk of harm and is "substantially greater than that which is necessary to make his conduct negligent." *Thompson v. McNeill,* 53 Ohio St.3d 102, 104–05, 559 N.E.2d 705, 708 (1990) (quoting Restatement (Second) of Torts § 500 (1965)).