Daryl MONDAY, Plaintiff–Appellant,

v.

Officer John OULLETTE and the City of Monroe, Defendants–Appellees.

No. 95–2363.

United States Court of Appeals, Sixth Circuit.

Argued June 9, 1997.

Decided July 2, 1997.

Victoria Eva Abdella (argued and briefed), Franklin, MI, Rodney Watts, Detroit, MI, for Plaintiff–Appellant.

Matthew A. Seward (argued), Rosalind Rochkind (briefed), Robert J. Squiers, Garan, Lucow, Miller, Seward, Cooper & Becker, Detroit, MI, for Defendants–Appellees.

Before: KEITH, KENNEDY, and MOORE, Circuit Judges.

## OPINION

KENNEDY, Circuit Judge.

Plaintiff appeals the grant of judgment as a matter of law by the District Court in favor of defendants in this 42 U.S.C. § 1983 action. Plaintiff sued defendants City of Monroe police officer John Oullette and the City of Monroe alleging that his Fourth and Fourteenth Amendment rights were violated when he was taken into protective custody without probable cause to believe that he was attempting to commit suicide, and that the use of pepper spray was per se excessive force when used in lieu of physical force. Plaintiff further asserts that the actions of Oullette violated state law. For the following reasons, we AFFIRM.

### I.

In February, 1994, plaintiff, a resident of Monroe, Michigan, was separated from his now ex-wife and in the process of getting a divorce. Plaintiff has a long history of drug and alcohol abuse, and suffers from depression. Plaintiff is approximately six feet tall and, in February of 1994, weighed about

three hundred pounds. Plaintiff was taking the prescription drug Xanax for his depression.

On February 2, 1994, after having drunk six beers, plaintiff tried to reach Jack Andrews, his counselor, at a number given to him by Andrews. Plaintiff instead reached Robert Martin, a psychologist with Monroe Community Mental Health, for which the number served as a hotline. During a brief conversation, plaintiff informed Martin that he was drinking, and Martin asked plaintiff whether he was taking his medication. When plaintiff responded that he was, Martin stated, "don't you know that can hurt you, or kill you," or words to that effect. After telling Martin either that "he could have cared less," or that he "could give a f___," plaintiff hung up. Although plaintiff had responded to an interrogatory during discovery by stating that he also told Martin that, "If I wanted to, I would take all of [my pills]," plaintiff could not remember at trial whether he had made that statement.

Martin, concerned that plaintiff might have overdosed, called the police and asked them to investigate. Martin then called plaintiff back and warned him about mixing drugs and alcohol. When Martin informed him that the police were coming to his house, plaintiff responded that they already had arrived and hung up.

Police Sergeant John Michrana had received the call from Martin, and understood Martin to have stated that plaintiff had overdosed on pills and needed to go to the hospital. Based on the conversation between Michrana and Martin, a radio dispatch issued; the dispatch announced that plaintiff had telephoned a mental health worker and stated that he was upset over a divorce and had ingested some pills and was drinking alcohol in a suicide attempt.

Defendant police officer Oullette responded to the dispatch. As plaintiff began to open his door, Oullette walked in. Shortly thereafter, police officer Thomas Mohrbach also arrived and entered the house. Plaintiff appeared coherent but intoxicated and depressed. Oullette told plaintiff that a person from Mental Health had told the police that they should come to this address because someone was committing suicide. The officers asked plaintiff whether he had any pills. Plaintiff, who had renewed his prescription on the previous day, withdrew a vial of Xanax from his shirt pocket. After the officers counted the pills and found that at least twenty were missing, they insisted to plaintiff that he go to the hospital. Plaintiff refused to go, denied having overdosed, sat down on the couch, and began to drink a bottled beer. Plaintiff told the officers to call his ex-wife because she could tell them that she was keeping the missing pills with her. Although the officers did not call the ex-wife, Oullette did call Sergeant Michrana, requesting advice. Based on the above information, Michrana told Oullette to take plaintiff to the hospital. Plaintiff, however, refused to go and asked the officers to leave.

Seven or eight people now were present in the living room of plaintiff, including several firemen and ambulance attendants with a stretcher. Having been in the house of plaintiff for about twenty minutes, Oullette finally told plaintiff that if he did not agree to go the hospital, he would be sprayed with pepper spray. Plaintiff responded by stating, "Well, I guess you're going to have to spray me." Oullette then sprayed plaintiff in the face with a single blast of pepper spray. Oullette testified that the spraying lasted one-to-two seconds. Plaintiff testified that he believed it was six to eight seconds. He was helped to a stretcher and taken to the hospital. Plaintiff had a severe reaction to the pepper spray and spent about five days in the hospital as a consequence.

The case was tried before a jury on October 23, 24, and 25, 1995. At the close of plaintiff's proofs, the District Court granted defendants' motion for judgment as a matter of law under FED.R.CIV.P. 50(a). Plaintiff appeals that ruling.

### II.

We review a decision to grant a Rule 50(a) motion *de novo*. *See, e.g., Aparicio v. Norfolk & W. Ry. Co.*, 84 F.3d 803, 806 (6th Cir.1996). Without weighing the evidence or assessing the credibility of the witnesses, and after drawing all reasonable inferences in

favor of plaintiff, we must determine whether the record contains evidence sufficient to have allowed reasonable jurors to find in favor of plaintiff. *See id.* at 806–07.

## A. Claims against Oullette

 The District Court granted judgment as a matter of law in favor of Oullette, finding that qualified immunity shielded him from any liability for both the seizure and the use of pepper spray. The doctrine of qualified immunity provides that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). When determining whether qualified immunity protects an official, we first must determine whether the plaintiff has presented facts which, if proven, demonstrate that the defendant violated a constitutional right. *See, e.g., Dickerson v. McClellan,* 101 F.3d 1151, 1157 (6th Cir. 1996); *Black v. Parke,* 4 F.3d 442, 446–49 (6th Cir.1993). If so, we then decide whether the defendant violated "clearly established constitutional rights of which a reasonable person would have known." *Dickerson,* 101 F.3d at 1158 (quoting *Christophel v. Kukulinsky,* 61 F.3d 479, 484 (6th Cir.1995)). The existence of qualified immunity is a legal question for the court, *see id.* at 1157, unless there is a genuine issue of material fact regarding whether the defendant actually committed acts which would violate a clearly established right. *See Black,* 4 F.3d at 445.

 The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others. *See Glass v. Mayas,* 984 F.2d 55, 58 (2nd Cir.1993); *Sherman v. Four County Counseling Ctr.,* 987 F.2d 397, 401 (7th Cir.1993); *Gooden v. Howard County, Md.,* 954 F.2d 960, 967–68 (4th Cir. 1992)(en banc); *Villanova v. Abrams,* 972 F.2d 792, 795 (7th Cir.1992); *cf. Rex v. Teeples,* 753 F.2d 840, 842–43 (10th Cir.1985)(holding that detainment for psycho-

logical evaluation must rest upon probable cause, but characterizing right as due process claim). If a dangerous mental condition is analogized to the role of criminal activity in traditional Fourth Amendment analysis, a showing of probable cause in the mental health seizure context requires only a "probability or substantial chance" of dangerous behavior, not an actual showing of such behavior. *See Illinois v. Gates,* 462 U.S. 213, 245 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). Just as actual innocence will not render an arrest invalid if it is based on then-existing probable cause that criminal activity is occurring, *see Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir.1988), a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition. Because "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts," *Gates,* 462 U.S. at 232, 103 S.Ct. at 2329, courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official. *See Criss,* 867 F.2d at 262–63.

 In this case, we agree with the District Court that Oullette had probable cause to believe that plaintiff was attempting to commit suicide, or at least might injure himself if not taken to a hospital. Oullette was responding to a radio dispatch that plaintiff had telephoned a mental health worker and stated that he was upset over a divorce and had ingested some pills and was drinking alcohol in an effort to commit suicide. When Oullette entered the home, plaintiff in fact was drinking alcohol and appeared intoxicated and depressed. A count of his Xanax pills by the officers revealed that at least twenty were missing.

While plaintiff appeared coherent and denied that he was attempting to commit suicide, Officer Mohrbach testified that, based upon his experience in responding to suicide attempts, people who have overdosed exhibit no typical behavior, the absence or presence of which will indicate reliably the true condition of an individual. Although plaintiff emphasizes that he informed the officers that he kept some of his pills with his ex-wife, and

that he unsuccessfully requested them to telephone her, we do not believe that plaintiff may base his claim upon these facts. Even if Oullette had contacted the ex-wife and confirmed that plaintiff kept some of his pills with her, it still would have been reasonable for Oullette to conclude that, given his information and the great potential harm at issue, an unacceptable risk remained that plaintiff was deceiving him in order to attain his apparently declared goal of committing suicide. *See Villanova*, 972 F.2d at 796 (existence of probable cause to impose mental health commitment turns upon whether the magnitude of the potential harm and the probability of that harm outweigh the cost of confinement to the individual); *see also Sherman*, 987 F.2d at 401–02 (probable cause supported involuntary commitment, given plaintiff's multiple threats against others and odd public behavior); *cf. Gooden*, 954 F.2d at 966–69 (qualified immunity protected officers who seized plaintiff for involuntary mental exam on basis of incorrect belief that violent sounds and screams in apartment complex were emanating from her apartment); *Harris v. Pirch*, 677 F.2d 681, 689 (8th Cir.1982)(qualified immunity protected officer who detained plaintiff for emergency evaluation, even though he knew that her vital signs were normal and admitted that he had no idea whether she had overdosed, because officer knew of plaintiff's recent hospitalization, plaintiff became angry when questioned, and plaintiff showed officer a partially empty bottle of pills).

█ Plaintiff suggests that Oullette violated a state-created liberty interest protected by the Fourteenth Amendment because he violated the dictates of the Michigan Mental Health Code by requiring plaintiff to receive emergency treatment without having a reasonable belief as to the need for such treatment. The version of the Michigan Mental

1. The Mental health Code defines "protective custody" as

> the temporary custody of an individual by a peace officer with or without the individual's consent for the purpose of protecting that individual's health and safety, or the health and safety of the public, and for the purpose of transporting the individual if the individual appears, in the judgment of the peace officer,

Health Code in effect at the time of the incident at issue, however, provides that an officer may take a person into protective custody in the following circumstances:

**330.1427. Person reasonably believed by peace officer to require treatment, custody, transportation**

Sec. 427.(1) If a peace officer observes an individual conducting himself or herself in a manner which causes the peace officer to reasonably believe that the individual is a person requiring treatment as defined in section [330.1401], the peace officer may take the individual into protective custody and transport the individual to a hospital for examination pursuant to section [300.1429] or may notify the community mental health emergency service unit for the purpose of requesting mental health intervention services. . . .

*See* MICH. COMP. LAWS ANN. § 330.1427(1) (West 1992).[1]

Further, a "person requiring treatment" under the Mental Health Code includes

> [a] person who is mentally ill, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself or another person, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

*See id.* at § 330.1401(a).

The Michigan Mental Health Code therefore required Oullette to exercise his judgment by acting only upon a reasonable belief that plaintiff required treatment because he could be expected to injure himself seriously in the near future. Accordingly, Oullette complied with § 330.1427(1) for the same reasons that he complied with the probable cause requirement of the Fourth Amendment.[2]

> to be a person requiring treatment or is a person requiring treatment. Protective custody is civil in nature and is not to be construed as an arrest.
>
> *See id.* at § 330.1400(m).

2. Plaintiff also argues that Oullette is liable under state law because he violated § 330.1427(1). It is unclear whether the Mental Health Code even provides a cause of action for a violation of

The Fourth Amendment prohibits the use of excessive force during the seizure of a free citizen. *See Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989). Accordingly, even when an officer has probable cause to seize an individual, the officer must employ a reasonable amount of force when effecting the seizure. *See id.* at 395, 109 S.Ct. at 1871. Plaintiff contends that the use per se of pepper spray under the circumstances here was excessive force. When determining whether the force used to effect a seizure was "reasonable," courts must balance carefully the competing interests of the individual and the government. *See id.* at 396, 109 S.Ct. at 1871–72.

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), ... its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* Courts assess "reasonableness" from the perspective of the reasonable officer on the scene, rather than with the benefit of hindsight. *See id.* Because the "reasonableness" test is an objective one, the intentions of the officer, good or evil, are irrelevant, *see id.* at 397, 109 S.Ct. at 1872–73, except that intent may bear on the issues of credibility or qualified immunity. *See id.* at 399 n. 12, 109 S.Ct. at 1873 n. 12.

Oullette employed pepper spray under the following circumstances. Plaintiff is approximately six feet tall and weighed about three hundred pounds at the time of the incident. Plaintiff had been drinking before Oullette entered his home, and, throughout the incident, continued to drink from a bottle of beer while sitting on a couch. While taking plaintiff's testimony as true, he was neither verbally nor physically combative, but he adamantly refused to go to the hospital. Oullette tried to persuade him to go to the hospital for about twenty minutes, during which time plaintiff consistently refused to do so. Eventually, Oullette stated to him that if he did not agree to go the hospital, Oullette would have to use pepper spray. Plaintiff responded that he guessed that Oullette would have to spray him.

Mohrbach, the other officer present, and Oullette testified that if Oullette had not used the spray, the officers would have had to place hands on plaintiff, which would have resulted in "trouble." Oullette testified that in his experience, using physical force could result in injury to the officers as well as the person to be seized. In view of plaintiff's size, his drinking and the beer bottle in his hand, Oullette chose to use pepper spray, which his department permitted him to do in his discretion. As the trial judge noted, when physical force is used, the citizen and the officer use force to overcome the other and excessive force may result.

We agree with the District Court that Oullette was reasonable to use pepper spray in order to get plaintiff onto the stretcher and to the hospital. First, Oullette had probable cause to believe that he was obliged to take plaintiff to the hospital because plaintiff had overdosed. This case therefore differs from *Adams v. Metiva*, 31 F.3d 375 (6th Cir.1994), in which we held that the defendant may have used excessive force by macing the plaintiff, who had disregarded an order to halt, because the officer may have lacked probable cause to detain or arrest the plaintiff and may have not told the plaintiff that he was under arrest. *See id.* at 384–85. Although Oullette did not suspect plaintiff of having committed a crime, he had reason to believe that the potential consequences of inaction would be serious. Further, and af-

§ 330.1427(1), or whether plaintiff's alleged claim should be construed as one arising under traditional tort law. Further, and as noted *infra*, it is unclear whether plaintiff effectively asserted any state law claims before the District Court, or merely alleged violations of federal law. Defen-

dants also note that state law provides Oullette with a degree of immunity from liability.

Regardless of these issues, however, Oullette cannot be liable under state law because he simply did not violate § 330.1427(1).

ter many minutes of fruitless discussion, Oullette warned plaintiff that he would spray him if he did not agree to go to the hospital. The decision by Oullette to act on his warning, rather than risk injury and further delay through a physical confrontation with a large and intoxicated person, did not constitute excessive force. Here, Oullette used only a single burst of pepper spray to get plaintiff on the stretcher, unlike the allegation in *Adams* that the plaintiff was unnecessarily sprayed a second time after he was subdued. *See id.* at 386.

While there was some disagreement as to the length of the burst of pepper spray, plaintiff presented no evidence regarding any difference between the effects of a one-to-two second burst of pepper spray and a six-to-eight second burst. Indeed, plaintiff's case was based on the per se use of pepper spray. His brief on appeal does not even mention the length of the burst.

Plaintiff argues that Oullette is liable under state law for his use of pepper spray. Plaintiff stresses that the Michigan Mental Health Code provides that officers taking an individual into protective custody may use only "that kind and degree of force which would be lawful were the peace officer effecting an arrest for a misdemeanor without a warrant," *see* MICH. COMP. LAWS ANN. § 330.1427a(1) (West 1992), and that an officer effecting protective custody is subject to civil liability for "gross negligence or wilful and wanton misconduct." *See id.* at § 330.1427b(2).

After a review of the complaint, the final pretrial order, and the directed verdict proceedings, it is unclear whether plaintiff effectively asserted or preserved a state law claim before the District Court. Further, it is unclear whether the asserted cause of action is a claim of common-law negligence or a statutory right created by the Mental Health Code.[3] Ultimately, however, Oullette cannot be liable under Michigan law for the use of excessive force for the same reasons which demonstrate that he complied with the

Fourth Amendment by acting reasonably when using pepper spray.

### B. Claims against the City of Monroe

▮ Plaintiff also seeks to recover from the City of Monroe. Because no constitutional violations occurred in this case, however, the City of Monroe necessarily is not liable to plaintiff. *See, e.g., Garner v. Memphis Police Dep't,* 8 F.3d 358, 365 (6th Cir.1993)(citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986))(municipality can be liable under § 1983 only for an actual constitutional violation committed by individual official).

### C. Claim of right to refuse treatment

▮ Plaintiff has suggested on appeal that defendants violated the Constitution by simply requiring him to go to the hospital because he apparently was attempting to commit suicide. That is, plaintiff asserts that he had a substantive right to refuse any treatment, even if he in fact had been attempting to kill himself and regardless of whether the government had honored all conceivable procedural safeguards. A review of the complaint, final pretrial order, and arguments at trial, however, reveals that plaintiff never asserted this complex claim before the District Court, and that the District Court never addressed it. Accordingly, he has waived this argument and we will not review it. *See, e.g., Thurman v. Yellow Freight Sys., Inc.,* 97 F.3d 833, 835 (6th Cir.1996).

### III.

Accordingly, we AFFIRM the decision of the District Court to grant judgment as a matter of law in favor of defendants.

---

3. The precise source of the claim has little practical significance because an officer performing his official duties is generally liable under the traditional tort law of Michigan only for gross negligence. *See* MICH. COMP. LAWS ANN. § 691.1407(2).