RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0020p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MICHAEL VICTOR,

*Plaintiff-Appellant*,

*v.*

No. 25-1317

KIMBERLY REYNOLDS; ADVANCED CORRECTIONAL
HEALTHCARE, INC.,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:20-cv-13218—Thomas L. Ludington, District Judge.

Decided and Filed: January 23, 2026

Before: GILMAN, GRIFFIN, and MURPHY, Circuit Judges.

───────────────

**COUNSEL**

───────────────

**ON BRIEF:** James B. Rasor, Amanda G. Washburn, RASOR LAW FIRM, PLLC, Royal Oak, Michigan, for Appellant. Christina A. Ginter, Katharine Gostek, KITCH ATTORNEYS & COUNSELORS, PC, Detroit, Michigan, for Appellees.

───────────────

**OPINION**

───────────────

MURPHY, Circuit Judge. If witnesses testify that they "do not remember" whether some event occurred, does their lack of recollection satisfy a plaintiff's burden to present enough evidence from which a reasonable jury could find that the event did, in fact, occur? This case raises that question. And we answer "no" on the facts presented.

Soon after an overnight detention in a county jail, Michael Victor suffered an epileptic seizure because he did not receive his anti-seizure medication while in the jail.  He blames the jail's medical provider: Advanced Correctional Healthcare (which goes by "ACH").  According to Victor, ACH's on-call practitioners either failed to return a corrections officer's middle-of-the-night phone call or denied Victor's medication during that call.  The problem?  The jail has no records that any officer called any ACH employee.  And neither the officers nor the ACH employees had any recollection of making or receiving such a call.  We agree with the district court that their "I have no recollection" testimony does not satisfy Victor's burden to show that a call occurred.  And although Victor testified that an officer had told him that a nurse refused to authorize his medication, this hearsay carried no weight.  So the district court correctly granted judgment as a matter of law to ACH.  We also reject Victor's other challenge to the district court's refusal to sanction ACH for its alleged discovery abuses.  We thus affirm.

I

Victor and his family live in Otsego County, Michigan.  He works a second-shift job at East Jordan Iron Works.  On Saturday, April 27, 2019, Victor woke up around noon after a late night at work.  That afternoon, he visited a high-school friend to help the friend repair a deck.  They drank 6 to 12 beers over several hours.

Around 9:00 p.m., Victor and his friend decided to visit Timothy's Pub in Gaylord.  While at this bar, Victor got into an argument with the bouncer.  Victor thought it best to leave.  But while he waited for a cab, police officers showed up.  When they asked to see Victor's ID, he refused.  Officer Blake Huff arrested him for disorderly conduct and resisting an officer.  Huff took Victor to the Otsego County Jail just after midnight.

This incarceration presented a problem for Victor.  After having a seizure years before, he had learned that he suffers from epilepsy.  To prevent future seizures, he takes an anti-seizure medication twice a day.  If he misses this medication, he will likely suffer a seizure.  Victor had taken his medication when he got up on April 27.  But he had not taken his evening allotment, planning to do so when he got back from the pub.  To make matters worse, his seizure risk increases when he drinks alcohol.

An officer alerted Victor's stepfather, the Otsego County prosecutor, of his arrest. Victor's friend likewise called to let his family know that he had not taken his medication. Victor's mother immediately drove to the jail to bring it to him. His mother gave the medication to Officer Huff and "stressed" that Victor "would have a seizure" if he did not take it. Curran Tr., R.167, PageID 3963–64. According to Huff, he gave the medication to Trey Leach (a corrections officer) and told Leach that Victor "needed to take the medication or he could possibly have a seizure." Huff Tr., R.168, PageID 4125, 4127. Huff then left the jail.

All agree that Victor was not handed this medication until the jail released him the next morning. But the reason remains a mystery. To be sure, the record shows what *should* have happened once Huff notified Leach about the medication. Otsego County had contracted with ACH to provide medical care to inmates. Under the contract, an ACH physician or mid-level practitioner remained on call "seven (7) days per week, twenty-four (24) hours per day." Agreement, R.45-2, PageID 511. If a medical need arose after hours, officers should fill out an "illness report" for the inmate. Webber Tr., R.168, PageID 4159. They should then call one of the ACH on-call providers to determine the course of treatment. The officers could not give medication to inmates without getting an ACH practitioner's permission.

Unfortunately, this process broke down in Victor's case. Leach recalled booking Victor into the jail. But he had no memory of Huff giving him Victor's medication. If Huff did give him the medication, Leach said he would have passed it on "to the senior officer on duty." Leach Tr., R.168, PageID 4212. Yet he also could not recall who that was on the night in question. The jail also had no records that an officer completed an "illness report" for Victor. Webber Tr., R.168, PageID 4160. Nor did it have evidence that any officer "called" an ACH employee or logged the medication that Victor's mother had brought into the jail. *Id.*, PageID 4161. And none of the four officers on duty during Victor's short time at the jail remembered calling an ACH employee about his medications. Nor did any ACH employee remember receiving any such call.

For his part, Victor said that he told the officer who medically screened him about his epilepsy. Unknown officers also allegedly confirmed that they "had [his] medication." Victor Tr., R.167, PageID 4056. Victor told them that he needed this medication or he would have a

seizure.  An officer allegedly responded that "they were going to reach out to a nurse and see if [he] could take [his] meds."  *Id.*   According to Victor, the officer later left him with the "understanding that a nurse was reached out to and that [he] could not have [his] meds because [he] had alcohol in [his] system." *Id.*, PageID 4060.

After Victor posted bond the next morning, the jail released him around 11:30 a.m.  Staff returned Victor's anti-seizure medication to him when he left.  By then, many hours had gone by from when he should have taken his medication the night before.  And Victor did not immediately take it upon his release out of frustration from all that had happened.  He instead called his friend to pick him up and walked to a bench to sit down as he waited.  On his way to the bench, though, Victor suffered a seizure.  Victor "woke up in an ambulance" with blood on his face, shirt, and hands.  *Id.*, PageID 4061–62.  He had fallen face-first onto the ground, split his chin, and broken his jaw.  Two days later, doctors performed surgery on his jaw.  He had to keep his jaw wired shut for over a month, which caused great pain.

In the operative complaint, Victor sued ACH and Kimberly Reynolds, an ACH nurse who staffed the jail.  He asserted that Reynolds had made the "ultimate decision" to deny his medication and that she had acted with deliberate indifference to his serious medical needs, in violation of the Due Process Clause.  Am. Compl., R.38, PageID 433, 437.  He also sought to hold ACH liable for this oversight under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Discovery revealed some notable things.  Nurse Reynolds testified that she worked at the Otsego County Jail twice per week for four hours and had never been "on-call" apart from these short shifts.  Reynolds Dep., R.45-4, PageID 529; Reynolds Aff., R.45-3, PageID 521.  As a nurse (rather than a doctor or nurse practitioner), she also could not approve medications. Reynolds Aff., R.45-3, PageID 522.  She thus testified that she "was not involved" with Victor or any decision over whether to give him anti-seizure medication.  *Id.*  ACH's records instead suggested that Courtney Brinkman, an ACH nurse practitioner, was the primary on-call contact on the night in question, and that Jill Nocerini, another ACH nurse practitioner, was the backup contact.  *See Victor v. Advanced Corr. Healthcare, Inc.*, 771 F. Supp. 3d 912, 919–20 (E.D. Mich. Feb. 28, 2025).  But Brinkman's phone records showed that she did not receive any call,

and Victor presented no evidence to suggest that Nocerini had received one. *See id.* Despite this lack of evidence, the district court refused to grant summary judgment to ACH or Reynolds. *See id.*

The case proceeded to trial. Victor presented fourteen witnesses, including the four officers who worked on the night of Victor's confinement, Nurse Practitioner Nocerini, and Nurse Reynolds. *See id.* at 925. At the close of the evidence, the district court instructed the jury that it could not hold Reynolds liable for deliberate indifference unless it found that an officer at the jail had called *her specifically* about Victor's medication. *See id.* at 922. And the court instructed the jury that it could not hold ACH liable on any *Monell* theory unless it found that a jail officer had called *any ACH employee* about Victor's medication. *See id.* at 922–23.

The jury issued a split verdict. It found in favor of Reynolds on Victor's claim against her because Victor failed to prove that any officer had contacted her. But the jury found in favor of Victor on his *Monell* claim against ACH. It determined that a jail officer had told another ACH employee about Victor's needs. The jury awarded Victor $20,000 in economic damages, $50,000 in noneconomic damages, and $700,000 in punitive damages.

After trial, ACH moved for judgment as a matter of law or for a new trial. The district court granted both motions. It granted judgment as a matter of law to ACH because it concluded that Victor did not present enough evidence for a reasonable jury to find that any officer had called any ACH employee on the night in question. *See id.* at 927–32. In the alternative, the court granted ACH a conditional new trial because the jury's verdict contradicted the great weight of the evidence and because its punitive-damages award was excessive. *See id.* at 932–37.

II

Victor raises six issues on appeal. He first challenges the district court's decision to grant ACH judgment as a matter of law, arguing that he presented enough evidence to permit the jury to find that an officer had contacted an ACH employee. He next challenges the instructions requiring the jury to find that an officer made this contact in order to hold ACH liable. He also argues that the district court should not have granted a conditional new trial. And he challenges

two evidentiary rulings.  Lastly, he argues that the district court should have sanctioned ACH for its alleged discovery violations.

The key issue is the first one.  On that issue, we conclude that the district court properly granted judgment as a matter of law to ACH.  And that conclusion allows us to avoid most of the other issues.  Most obviously, the conclusion moots any need to review the district court's alternative grant of a new trial.  It also moots any need to consider Victor's evidentiary challenges because he concedes that those challenges matter only if we find "a new trial" appropriate.  Appellant's Br. 52, 54.  And Victor's concern with the jury instructions just repackages the same legal claims he makes when attacking the decision to grant judgment as a matter of law.  We thus need to address only that decision and the denial of sanctions.

### A. Judgment as a Matter of Law

Victor argues that the district court should not have granted judgment to ACH because he presented enough evidence to prove ACH's liability.  A district court may grant judgment as a matter of law on an issue if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]"  Fed. R. Civ. P. 50(a)(1).  The question whether to grant judgment as a matter of law thus follows the same standards as the question whether a genuine issue of material fact exists for summary-judgment purposes.  *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).  At both the summary-judgment and post-trial stages, we must resolve all conflicts in the evidence and draw all reasonable inferences in the nonmoving party's favor.  *See id.*  At both stages, we must ask whether the record would permit "reasonable jurors" to resolve the relevant issue for the nonmovant.  *See Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997).  And at both stages, we must review the district court's decision de novo.  *See Lowe v. Walbro, LLC*, 147 F.4th 601, 607 (6th Cir. 2025).  Unlike at the summary-judgment stage, though, we consider this question against the evidence that the parties introduced at trial—not the evidence that they attached to their summary-judgment briefs.  *See Dupree v. Younger*, 598 U.S. 729, 734 (2023).

Did Victor present enough evidence to allow "reasonable jurors" to rule in his favor?  *Monday*, 118 F.3d at 1102.  Our answer begins with the background law.  Plaintiffs may sue any

"person" who deprives them of a constitutional right "under color of" state law. 42 U.S.C. § 1983. As relevant here, the Fourteenth Amendment prohibits state officers from acting with deliberate indifference to a pretrial detainee's serious medical needs. *See Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 926–28 (6th Cir. 2024). And the parties agree that ACH's employees qualify as state actors under § 1983 when they provide care to inmates. *Cf. Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018). But § 1983 does not permit Victor to hold a defendant like ACH "vicariously liable for" its employees' deliberate indifference. *Hehrer v. County of Clinton*, 161 F.4th 955, 967 (6th Cir. 2025) (citing *Monell*, 436 U.S. at 691). Instead, Victor may hold ACH liable only for its own "policy" or "custom." *Gambrel v. Knox County*, 25 F.4th 391, 408 (6th Cir. 2022) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997)).

To satisfy this element, Victor alleged (and the jury found) that ACH had "a persistent and widespread custom or practice of withholding" medications from detainees. Verdict, R.165, PageID 3908. He supported this claim with a list of over thirty-five allegations that ACH provided inadequate care in past situations. And he supported it with testimony from three of the four on-duty officers. These officers testified that "[s]ometimes" nobody on the ACH on-call list would return a call for middle-of-the-night issues. Sullivan Tr., R.167, PageID 4016–17, 4019; Tallent Tr., R.168, PageID 4132–33; Musall Tr., R.168, PageID 4178. The officers would instead have to wait until the morning to get ACH's authorization for medical care. Musall Tr., R.168, PageID 4178. On appeal, ACH does not dispute that this evidence sufficed to show a policy or custom, so we may assume as much.

Still, Victor must connect ACH's policy or custom to the alleged constitutional violation in his case: the failure to give him his anti-seizure medication. To make this connection, he must satisfy a "rigorous" causation element. *Brown*, 520 U.S. at 405. The policy or custom must have "directly caused" the violation. *Id.*; *see Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). And if the failure to give Victor his medication resulted from the *officers'* mistake (in failing to call an ACH provider) rather than an *ACH provider's* mistake (in failing to respond), then "reasonable jurors" could reach but one conclusion: that the policy or custom did not cause the violation. *Monday*, 118 F.3d at 1102. Victor thus needed to present enough

evidence to establish that an officer alerted an ACH employee about Victor's urgent medical need.

But Victor lacks the required evidence. At the outset, he faces significant headwinds because of two pieces of evidence that suggest the officers did *not* make any call. For one thing, it is undisputed that no physical evidence exists of this call. Brian Webber, the jail administrator, investigated the incident after Victor's injury. Webber Tr., R.168, PageID 4144, 4160. Webber collected "every bit of documentation that [he] could" and determined that the four officers working on the night in question had "not called" any ACH employee about Victor. *Id.*, PageID 4160–61, 4164. Webber reached this conclusion because of the lack of any record of such a call. No officer had prepared an "illness report" for Victor. *Id.*, PageID 4160. Nor did any officer record the call in the jail logs. *Id.*, PageID 4161. Victor likewise produced no records of the phone calls that the officers made from the jail's phones or their cell phones around the relevant time.

For another thing, the jury found that Victor had not shown that any of the officers "told" Nurse Reynolds about his medical needs. Verdict, R.165, PageID 3905. She testified that her license did not permit her to approve medications. Reynolds Tr., R.168, PageID 4222. And she testified that she had "[n]ever" been on call and that the officers would contact her only for non-medical issues (such as where to find something at the jail). *Id.*, PageID 4224, 4228, 4230.

Victor thus can hold ACH liable only if he proved that employees *other* than Reynolds acted with deliberate indifference. To decide whether he met his burden, we will first consider the testimony from other ACH employees and the jail officers before turning to Victor's statements.

*ACH and Officer Testimony.* What do the ACH employees have to say on this question? The record lacks evidence about who served as the primary on-call provider for ACH on the night in question. The pretrial evidence showed that ACH had assigned Courtney Brinkman as the primary on-call nurse practitioner and Jill Nocerini as her backup. *See Victor*, 771 F. Supp. 3d at 919–20, 929. But neither party introduced this evidence at trial. Likewise, neither party called Brinkman to testify about whether officers had contacted her. They also chose not to

introduce her phone records—which suggested that she had not received any such calls. *See id.* at 929.

Nocerini thus was the only other ACH employee with potential knowledge of the events. Victor did ask her to testify. She stated that she was ACH's "backup" on-call provider for the jail at the relevant time. Nocerini Tr., R.168, PageID 4120. Yet she added that she did not "recall" ever missing any calls from the officers. *Id.*, PageID 4105. And she had no "recollection" of whether she took a call from the officers on the night in question. *Id.*, PageID 4112.

How about the four officers at the jail during Victor's short incarceration? Their testimony was equally unhelpful. Officers Trey Leach and Tony Tallent were on duty during the first part of the night. But Leach answered "I do not" when asked if he remembered contacting any ACH employee. Leach Tr., R.168, PageID 4213. He later reiterated "I'm not positive if I called," explaining that "it's been about five years." *Id.*, PageID 4216. He also suggested that he would "always log" calls made to ACH—even if ACH employees did not answer. *Id.*, PageID 4214–15. For his part, Tallent testified that he had not even known that Victor's mom brought medication to the jail. Tallent Tr., R.168, PageID 4129. And Tallent explained that he "had no involvement" with Victor's medication and did not call ACH about Victor. *Id.*, PageID 4141.

Officers Joe Sullivan and Scott Musall took over at some point in the early morning between 4 and 6 a.m. Sullivan did not remember "reaching out to anyone" at ACH about Victor's medication. Sullivan Tr., R.167, PageID 4022, 4031. He also opined that he did not "believe" he was involved in the event, but he could not "remember." *Id.*, PageID 4029. Sullivan likewise said he "always" logged his calls to an ACH provider, although he admitted there may have been "times" when he forgot. *Id.*, PageID 4023. Lastly, Musall testified that he was not aware of anyone calling ACH that night and was not aware that Victor's medication had even reached the jail. Musall Tr., R.168, PageID 4175, 4184.

To sum up, Nocerini did not recall taking a call from the officers. Officers Tallent and Musall categorically denied making such a call or participating in Victor's care. And Officers Leach and Sullivan said that they could not remember whether they called but that they always

(or generally) logged attempts to contact ACH providers. But there was no record of a call. At best, then, Victor's evidence amounts to statements that witnesses could not remember any call.

We hold that their "lack of memory" does not suffice to withstand ACH's motion for judgment as a matter of law. *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 541 (5th Cir. 2015); *see Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 839 (6th Cir. 2021); *Larsen v. Citibank FSB*, 871 F.3d 1295, 1308 (11th Cir. 2017); *Harriman v. Hancock County*, 627 F.3d 22, 34 (1st Cir. 2010); *Shawmut Bank N.A. v. Kress Assocs.*, 33 F.3d 1477, 1501 (9th Cir. 1994). To start, Victor bore the burden to prove that "*more likely than not*" an officer made a call. *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020). And a witness cannot "create a dispute of fact" about whether an event occurred if the witness "has no recollection" of the event. *Pratt v. Brown Mach. Co.*, 855 F.2d 1225, 1233 (6th Cir. 1988); *see Wysong v. City of Heath*, 260 F. App'x 848, 857 (6th Cir. 2008). At most, this type of statement leaves the record in "equipoise" over whether the event happened—and thus the statement cannot satisfy the plaintiff's affirmative burden to prove that it did, in fact, happen. *Pineda*, 977 F.3d at 491 (citation omitted). In short, testimony that the officers do not remember "does not prove anything." *Shawmut*, 33 F.3d at 1501.

*Victor's Testimony.* This conclusion leaves Victor's testimony. He made two key statements about what the corrections officers allegedly told him. First, he testified that an officer told him that "they were going to reach out to a nurse and see if [he] could take [his] meds." Victor Tr., R.167, PageID 4056. Second, he testified that another conversation left him with the "understanding that a nurse was reached out to and that [he] could not have [his] meds because [he] had alcohol in [his] system." *Id.*, PageID 4060. Neither statement would permit "reasonable jurors" to find that the officers called. *Monday*, 118 F.3d at 1102. Of most note, Victor lacked "*personal knowledge*" that any officer called any ACH employee. *Boykin*, 3 F.4th at 841. And his second-hand remarks about what the officers conveyed do not create a jury question.

Start with Victor's latter statement: that he had the impression that the officers "reached out" to a nurse, who denied him his medications because of the "alcohol" he drank. Victor Tr., R.167, PageID 4056. We agree with the district court that this statement qualified as

"inadmissible" hearsay and thus that we need not consider it. *Victor*, 771 F. Supp. 3d at 930–31. A court deciding whether to grant a motion for judgment as a matter of law must address only the "*legally sufficient* evidentiary basis" for the nonmovant's position. Fed. R. Civ. P. 50(a)(1) (emphasis added). As a result, courts may set aside "[i]nadmissible evidence" when deciding whether a lawful basis exists for a verdict. *Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2000); *see Sardis v. Overhead Door Corp.*, 10 F.4th 268, 279 (4th Cir. 2021).

And Victor's statement was inadmissible hearsay. The statement conveyed what an officer allegedly said to Victor about what a nurse allegedly said to the officer. But the Federal Rules of Evidence generally prohibit parties from introducing hearsay (out-of-court statements offered "to prove the truth of the matter asserted") unless they identify an exclusion or exception. Fed. R. Evid. 801(c), (d), 803. Victor unquestionably offered both parts of this out-of-court statement (that an officer had contacted a nurse and that the nurse had denied the medication request) to prove the truth of these points. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926–27 (6th Cir. 1999); *Cincinnati Fluid Power, Inc. v. Rexnord, Inc.*, 797 F.2d 1386, 1394–95 (6th Cir. 1986). Although the nurse's alleged statement to the officer might not qualify as hearsay because it was made by ACH's "agent," Fed. R. Evid. 801(d)(2)(D), Victor identifies no hearsay exception for the officer's statement to him.

Turn now to Victor's former statement: that an officer told him that he was "going to reach out to a nurse[.]" Victor Tr., R.167, PageID 4056. This statement fell within a well-established exception to the hearsay rule. That exception allows parties to introduce hearsay to show a "declarant's then-existing state of mind," such as the declarant's "intent" to engage in some future act. Fed. R. Evid. 803(3). And proof of this intent, in turn, makes it "more probable" that the declarant later went through with the act. *Mutual Life. Ins. Co. of New York v. Hillmon*, 145 U.S. 285, 296 (1892). So courts "routinely admit[]" statements of a party's intent to engage in a future act to prove that the party did, in fact, engage in that act. 2 Kenneth S. Broun et al., *McCormick on Evidence* § 275 (9th ed.), Westlaw (database updated Feb. 2025). Here, then, the district court properly admitted the statement to show the officer's intent to call an ACH provider about Victor's medication to prove that the officer later made the call. *See Victor*, 771 F. Supp. 3d at 931–32.

That said, just because this statement is *relevant* to whether an officer called an ACH provider does not make it *sufficient* to prove the call. Rather, courts typically treat statements of an intent to engage in a future act as "insufficient to support the finding" that the speaker engaged in the act without "corroboration" from "other evidence" that proves the act. *McCormick on Evidence*, supra, § 275; *see United States v. Washington Water Power Co.*, 793 F.2d 1079, 1082 n.4 (9th Cir. 1986); *United States v. Moore*, 571 F.2d 76, 82 (2d Cir. 1978). Thus, without additional evidence that the call occurred, this lone statement of intent does not suffice. And Victor lacks the required corroboration because no records reveal that an officer made the call. Moreover, the witnesses testified either that no call occurred or that they could not recall one way or the other.

Victor's contrary arguments lack merit. Starting with the law, he quarrels with the district court's requirement that he show that an officer contacted an ACH employee in order to impose *Monell* liability on ACH. As support, he points to caselaw holding that an entity can face *Monell* liability even when none of its employees committed an individual constitutional violation. *See Grote v. Kenton County*, 85 F.4th 397, 414 (6th Cir. 2023). So, for example, a plaintiff can prove a *Monell* claim by establishing that several officers engaged in actions that collectively violated the Constitution (even if none of the actions would have sufficed by themselves). *See Epps v. Lauderdale County*, 45 F. App'x 332, 335 (6th Cir. 2002) (Cole, J., concurring). But Victor fails to explain why this law matters here. He still must prove that ACH's policy or custom "directly caused" the constitutional violation in his case. *Brown*, 520 U.S. at 405. And if the officers negligently failed to alert ACH providers of Victor's needs, he could not prove this "rigorous" causation element. *Id.*

Transitioning to the facts, Victor notes that a reasonable jury could rule in his favor based on circumstantial evidence alone. But he mistakes the *absence* of evidence for *circumstantial* evidence. All the witnesses denied making or receiving a phone call or could not remember. And no records exist of this call even though the officers normally logged such calls. So Victor's only circumstantial evidence consists of the officer's alleged statement to him that the officer planned to call the nurse in the future. As we have explained, though, courts typically hold that statements of future intent do not suffice on their own to establish the intended act.

Victor next challenges the district court's conclusion that he introduced inadmissible hearsay when he testified about his "understanding that a nurse was reached out to and that [he] could not have [his] meds because [he] had alcohol in [his] system." Victor Tr., R.167, PageID 4056. As Victor sees things, this statement did not qualify as hearsay because he admitted it to show the "effect on the listener." Appellant's Br. 33. His claim is wrong twice over. On the one hand, his counsel relied on the statement during closing argument to establish the truth of the matter asserted: that a call had been made and that a nurse had denied the medication. Tr., R.172, PageID 4487. On the other hand, he fails to explain why his own state of mind (that is, the "effect" that the statement had on him) was even relevant to any issue in this case.

Victor separately claims that the statement had "independent legal significance" to his *Monell* claim. Appellant's Br. 33. But he fails to identify this significance. Unlike the claim in the case he cites, the *Monell* claim did not turn on the mere *fact* that an officer made the statement to him—regardless of its *truth*. *Cf. United States v. Tyler*, 281 F.3d 84, 98 (3d Cir. 2002).

Apart from the merits, Victor also suggests that ACH forfeited this hearsay objection by failing to raise it in its motion for judgment as a matter of law. Yet the case he cites held that parties forfeit a post-trial motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) if they do not first move for such a judgment under Rule 50(a) before submitting the case to the jury. *See Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 780–81 (6th Cir. 2020). ACH preserved its motion here by first moving under Rule 50(a).

Victor lastly claims that the district court's decision to grant ACH judgment as a matter of law conflicts with its decision to deny summary judgment to ACH. The court denied summary judgment because it found that a reasonable jury could find that ACH contacted Nurse Reynolds. But the jury found that an officer did *not* contact Reynolds. When reviewing the evidence after the trial, then, the court addressed a different issue: did the evidence suffice to show that the officers contacted someone else? Besides, even if this conflict existed, Victor fails to explain why it would change things. In departing from its earlier ruling, the district court might have seen "no reason why [it] should be consciously wrong today because [it] was unconsciously wrong yesterday." *Massachusetts v. United States*, 333 U.S. 611, 639–40 (1948)

(Jackson, J., dissenting).  And it would have been wrong to deny ACH's motion for judgment as a matter of law given the lack of evidence that any officer called any ACH provider.

### B. Discovery Sanctions

Victor also argues that the district court should have granted his motion for sanctions and entered a default judgment for ACH's discovery violations.  District courts may sanction parties if they violate "an order to provide or permit discovery," and these sanctions may include a "default judgment" against the noncompliant party.  Fed. R. Civ. P. 37(b)(2)(A).  When reviewing a sanctions request, courts should consider several factors, including whether a party violated an order in bad faith.  *See Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997).

Here, Victor claims that the trial evidence showed that ACH willfully committed two serious discovery violations.  Yet the district court held that ACH did not violate its discovery orders in the two claimed ways.  And we review a district court's decision over whether to sanction a party under a deferential abuse-of-discretion standard.  *See Prime Rate Premium Fin. Corp. v. Larson*, 930 F.3d 759, 768 (6th Cir. 2019).  We see no abuse in this case.

As for the first alleged violation, Victor argues that a discrepancy existed between ACH's discovery claims and Nocerini's trial testimony.  ACH asserted during discovery that it gave no medical-care training materials to its nurse practitioners and instead relied on their medical judgments.  *See Victor v. Advanced Corr. Healthcare, Inc.*, 2025 WL 502087, at *5 (E.D. Mich. Feb. 14, 2025).  Nocerini, by contrast, testified that she received an employee handbook and training manual.  *See id.* at *6.  Victor moved for sanctions on the ground that Nocerini's testimony showed that ACH had lied when it said it had no training materials.  *See id.* at *5.  But he ignores how the district court reconciled the two statements.  Victor had asked for *medical* training materials in discovery and Nocerini had discussed *human-resources* training materials at trial.  *See id.* at *7.  The court did not abuse its discretion in finding that no conflict existed between the two statements.  Indeed, its reasoning remains unchallenged on appeal.

As for the second alleged violation, Victor argues that another discrepancy existed between a notation that ACH made on Nocerini's payroll timesheets and Nocerini's testimony.  ACH's notation suggested that Nocerini had not "worked at [Otsego County Jail] on 4/28/19."

*See id.* But Nocerini testified at trial that she was on call "24/7" and her timesheets would not reflect whether she got a phone call on a specific date. *See id.* at *8. Victor moved for sanctions on the ground that the notation on Nocerini's timesheet amounted to "fraud on the court." *Id.* Here too, Victor ignores how the district court reconciled the statements. The notation merely showed that Nocerini had not *physically* worked at the jail on the date in question; it did not disclose whether she had received a call on that date. *See id.* So the court again reasonably reconciled the two statements, and Victor offers no rebuttal to its reasoning.

We affirm.